Slip Op. 07-73

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MITTAL STEEL GALATI S.A., FORMERLY KNOWN AS ISPAT SIDEX S.A., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Court No. 06-00050 |

## OPINION

[Plaintiff's motion for judgment on the agency record denied; Commerce's administrative review results sustained.]

Dated: May 14, 2007

    Arent Fox Kintner Plotkin & Kahn, PLLC (John M. Gurley, Diana Dimitriuc Quaia) for Plaintiff Mittal Steel Galati S.A., formerly known as Ispat Sidex S.A.

    Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (David F. D'Alessandris); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (Arthur D. Sidney), of counsel, for Defendant United States.

    Wiley Rein & Fielding (Alan H. Price, Timothy C. Brightbill) for Defendant-Intervenor Nucor Corporation.

    Schagrin Associates (Roger B. Schagrin, Michael J. Brown) for Defendant-Intervenor IPSCO Steel Inc.

    Gordon, Judge: Plaintiff Mittal Steel Galati S.A. challenges two decisions of the

U.S. Department of Commerce ("Commerce") during the 2003-2004 administrative review

of the antidumping duty order covering certain cut-to-length carbon steel plate from

Romania.  See Certain Cut-to-Length Carbon Steel Plate from Romania, 71 Fed. Reg.

7,008 (Dep't of Commerce Feb. 10, 2006) (final results and partial rescission) ("Final Results").  First, Plaintiff contends that Commerce erred in assigning Plaintiff a total adverse facts available rate of 75.04 percent ad valorem.  Second, Plaintiff contends that Commerce's policy of issuing liquidation instructions within 15 days of the publication of the final results of an administrative review is per se unlawful.

The court has jurisdiction to review Plaintiff's first issue pursuant to Section 516a(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000)[1] and 28 U.S.C. § 1581(c) (2000).  The court has jurisdiction to review Plaintiff's second issue under the same jurisdictional provision, or alternatively, under 28 U.S.C. § 1581(i) (2000).

As discussed further below, Plaintiff's total adverse facts available rate of 75.04 percent is supported by substantial evidence and is in accordance with law.  Also, Commerce's 15-day liquidation instruction policy is in accordance with law.  The court therefore sustains Commerce's Final Results and denies Plaintiff's motion for judgment on the agency record.

## II. Standard of Review

When reviewing Commerce's administrative review final results under 28 U.S.C. § 1581(c) (2000), the Court of International Trade sustains Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing whether Commerce's actions are unsupported by substantial

---

[1] Further citations to the Tariff Act of 1930 are to the relevant provision in Title 19 of the U.S. Code, 2000 edition.

evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  When reviewing Commerce's actions under 28 U.S.C. § 1581(i), the Court holds unlawful an agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2000); 28 U.S.C. § 2640(e) (2000).

## III. Discussion

### A. Adverse Facts Available Rate

In the preliminary results of the administrative review, Commerce calculated an antidumping duty rate of 48.90 percent ad valorem for Plaintiff.  Certain Cut-to-Length Carbon Steel Plate from Romania, 70 Fed. Reg. 53,333, 53,338 (Dep't of Commerce Sept. 8, 2005) (preliminary results) ("Preliminary Results").  After the Preliminary Results, Plaintiff informed Commerce that it discovered a significant quantity of subject merchandise that it failed to report in the administrative review, but Plaintiff did not disclose the quantity or value of the unreported subject merchandise.  Shortly after this revelation, Plaintiff abruptly curtailed its participation in the proceeding by foregoing a scheduled cost verification and removing its business proprietary data from the record.  Final Results, 71 Fed. Reg. at 7,010.

In the Final Results Commerce found that Plaintiff had both withheld information and significantly impeded the administrative review, requiring Commerce to use facts otherwise available to complete the review.  Id.  Commerce also found that Plaintiff had failed to cooperate by not acting to the best of its ability to comply with a request for information,

justifying application of adverse facts available. <u>Id.</u> at 7,011.  Plaintiff does not challenge

these findings. <u>See</u> Pl.'s Mot. J. Agency R. at 10.  Plaintiff instead challenges the 75.04

percent rate that Commerce selected and assigned as total adverse facts available.

<u>Id.</u> at 11.

      In a total adverse facts available scenario, Commerce may not be able to calculate

an antidumping rate for the uncooperative respondent because the information required for

such a calculation (the respondent's sales and cost information for the subject merchandise

during the period of review) typically is not available or has not been provided.  As a

substitute, Commerce relies on the petition, the final determination from the investigation,

prior administrative reviews, or other information placed on the record, 19 U.S.C.

§ 1677e(b), to select a proxy that should be a "reasonably accurate estimate of the

respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-

compliance." <u>F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d

1027, 1032 (Fed. Cir. 2000) ("de Cecco").

      Among the rates available to Commerce in the administrative proceeding were the

48.90 percent rate calculated for Plaintiff in the <u>Preliminary Results</u> and the

75.04 percent all others rate that was derived from the petition when Romania was a non-

market economy.[2]  In the <u>Final Results</u> Commerce reasoned that any adverse facts

available rate for Plaintiff needed to be higher than 48.90 percent.  <u>Issues and Decision</u>

---

[2] <u>See</u> <u>Certain Cut-to-Length Carbon Steel Plate from Romania</u>, 58 Fed. Reg. 37,209 (Dep't of Commerce Jul. 9, 1993) (final determination). Commerce reclassified Romania as a market economy for antidumping and countervailing duty proceedings effective January 1, 2003.  <u>Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Romania</u>, 68 Fed. Reg. 12,672, 12,673 (Dep't of Commerce Mar. 17, 2003) (final results).

Memorandum for Administrative Review of Certain Cut-to-Length Carbon Steel Plate from Romania, at 15-16, A-485-803, ADR: 08/01/2003--07/31/2004 (Feb. 6, 2006), available at http://ia.ita.doc.gov/frn/summary/romania/E6-1880-1.pdf, ("Decision Memorandum").  That rate was a cooperative rate—Plaintiff's non-compliance occurred after it was calculated, and Commerce inferred that Plaintiff's actual rate was therefore higher than 48.90 percent. See Decision Memorandum at 10-11 ("an adverse inference is warranted").  Commerce also believed that a rate higher than 48.90 percent would serve as a deterrent to Plaintiff's future non-compliance.  See Final Results, 71 Fed. Reg. at 7011.  These conclusions are both reasonable and consistent with the adverse facts available provision of the antidumping statute and the Federal Circuit's guidance in de Cecco.  The only rate higher than 48.90 percent was the all-others rate of 75.04 percent, which Commerce first corroborated and then assigned to Plaintiff.  Id.

Plaintiff first contends that the statutory provisions governing non-market economy calculations prohibit the assignment of a non-market economy rate within a subsequent market economy proceeding.  See Pl.'s Mot. J. Agency R. at 11-16; Pl.'s Reply Br. at 3-4 (citing 19 U.S.C. § 1677b(c)(1)).  The court reviews disputed interpretations of the antidumping statute under the framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984).  The court first considers whether Congressional intent on the issue is clear, and if not, whether Commerce's interpretation is reasonable.  Id.; Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

Here, Congressional intent is clear.  The express language of the adverse facts available provision authorizes Commerce to rely on information from the petition irrespective of whether that information is from a market or non-market economy proceeding.  See 19 U.S.C. § 1677e(b).  When operating in an adverse facts available situation, Commerce needs access to additional sources of information to complete the administrative review.  Plaintiff's proposed interpretation would limit the available pool of information on which Commerce may rely, contrary to the purpose of the adverse facts available provision.  Therefore, Commerce may, in a market economy proceeding, assign to a respondent a total adverse facts available rate derived from a prior, non-market economy proceeding.  Whether Commerce should commingle a non-market economy rate with a market economy proceeding does not go to the question of whether Commerce acted in accordance with law, but to whether that action is reasonable given the facts and circumstances presented by the administrative record—that is—whether it is supported by substantial evidence.

Plaintiff next argues that Commerce, in practice, eschews adverse facts available rates derived solely from the petition in favor of rates that have been calculated with respondent information, and that Commerce's administrative precedents preclude it as a matter of law from relying solely on petition information for an adverse facts available rate.  Pl.'s Reply Br. at 7-8; Pl.'s Mot. J. Agency R. at 16-17.[3]  This is an odd assertion because the statute explicitly authorizes Commerce to rely on petition information in adverse facts

---

[3] Plaintiff cites NSK Ltd. v. United States, 27 CIT 56, 103, 245 F. Supp. 2d 1335, 1373 (2003); Kompass Food Trading Int'l v. United States, 24 CIT 678, 684 (2000); and Shanghai Taoen Int'l Trading Co., Ltd. v. United States, 29 CIT __, 360 F. Supp. 2d 1339 (2005).

available situations.  See 19 U.S.C. § 1677e(b); de Cecco, 216 F.3d at 1032 ("the statute

explicitly allows for use of 'the petition' to determine relevant facts when a respondent does

not cooperate").    Plaintiff nevertheless suggests that Commerce no longer has that

authority, purportedly abandoning it through administrative practice.  Pl.'s Reply Br. at 7-8.

In actuality, Commerce has not so limited itself.  See, e.g., Stainless Steel Bar from India,

69 Fed. Reg. 55,409, 55,410 (Dep't of Commerce Sept. 14, 2004) (final results) (using

petition rate).  A fair reading of the adverse facts available precedents cited by Plaintiff (in

which Commerce opted for a rate other than a petition rate) simply demonstrate Commerce

exercising its "discretion to choose which sources and facts it will rely on to support an

adverse inference when a respondent has been shown to be uncooperative . . . [to] create

the proper deterrent to non-cooperation . . . and assure a reasonable margin."  de Cecco,

216 F.3d at 1032.  The more relevant question is not whether Commerce's administrative

precedents preclude Commerce as a matter of law from relying on an adverse facts

available rate derived solely from petition information—they do not—but the extent to which

they inform the reasonableness of Commerce's selection of such a rate.

        Standing alone, a 12-year old petition rate from a non-market economy proceeding

may not seem to be an appropriate proxy for a market economy dumping margin.  In the

context of the Final Results, however, the assigned rate is a reasonable, if not correct,

choice.  As already noted, Plaintiff received a cooperative 48.90 percent rate in the

Preliminary Results.    Afterwards, Plaintiff disclosed that it failed to report subject

merchandise, declined to participate in a scheduled cost verification, and removed all of its

proprietary information from the administrative record.  Plaintiff's conduct led Commerce to

infer that Plaintiff's actual dumping rate was higher than 48.90 percent.  Exactly how much higher is not ascertainable because Plaintiff removed its sales and cost data from the record.  Ideally, the proxy rate selected for Plaintiff should be a "reasonably accurate estimate of the respondent's actual rate," (something higher than 48.90 percent), "with some built-in increase intended as a deterrent to non-compliance."  de Cecco, 216 F.3d at 1032.  When viewed in this light, the 75.04 percent rate seems not only reasonable, but a logical and appropriate choice.

The only remaining consideration is the reasonableness of Commerce's corroboration of the rate pursuant to 19 U.S.C. § 1677e(c).  The statute's corroboration requirement provides that if Commerce relies upon secondary information, Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c).  The statute does not prescribe any methodology for corroborating secondary information, but the Statement of Administrative Action explains that "corroborate" means that Commerce should satisfy itself that any secondary information used has "probative value." See Uruguay Round Agreements Act Statement of Administrative Action, H.R. REP. NO. 103-316, vol. 1 at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4199.  Commerce assesses the probative value of secondary information by examining the reliability and relevance of the information to be used.  See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 54,711, 54,712-13 (Sept. 16, 2005) (final results).

Plaintiff alleges in its opening brief that Commerce's corroboration efforts were not reasonable because the 75.04 percent rate was calculated in 1992 using a non-market

economy methodology, and is therefore outdated, unreliable, aberrational, and irrelevant. See Pl.'s Mot. J. Agency R. at 17-28. These arguments are unpersuasive, though, because Plaintiff fails to acknowledge the cooperative 49.80 percent margin that Plaintiff received in the Preliminary Results. See Id. Indeed, it is not until its reply brief that Plaintiff begins to address the meaning and import of this central fact from the administrative record. See Pl.'s Reply Br. at 5-6, 7, 14.

Contrary to Plaintiff's claims, Commerce's corroboration of the 75.04 percent rate was reasonable. Commerce transferred documentation from the record in the 2002-2003 administrative review which contained both market economy and non-market economy data specific to Plaintiff. See Total Adverse Facts Available and Corroboration Memorandum for Company Rate for Administrative Review of Certain Cut-to-Length Carbon Steel Plate from Romania, at 6, A-485-803, ADR: 08/01/2003--07/31/2004 (Feb. 6, 2006) ("Corroboration Memo") (Pub. R. 143).[4] In comparing the 75.04 percent rate with Plaintiff's data from the previous administrative review, Commerce found the rate conservative because there were sales exceeding 75.04 percent rate, and there were sales below that rate but within a ten percent range. Id. at 7. Commerce reasonably concluded that these rates were "sufficiently approximate to the 75.04 percent, to establish the reliability of the 75.04 percent rate to be used as the adverse facts available rate." Id.[5] See Ta Chen Stainless Steel Pipe, Inc., v. United States, 298 F.3d 1330, 1339-40 (Fed. Cir. 2002) ("Commerce

---

[4] The public version of the administrative record is cited as "Pub. R."

[5] Commerce went further and provided a detailed analysis of its corroboration of the secondary information concerning export price and normal value. See Corroboration Memo at 7-8.

acts within its discretion so long as the rate chosen has a relationship to the actual sales information available.")

Relying on <u>Shandong Huarong General Group Corp. v. United States</u>, 29 CIT ___, Slip. Op. 05-129 (Sept. 27,, 2005) and <u>Am. Silicon Techs. v. United States</u>, 26 CIT 1216, 240 F. Supp. 2d 1306 (2002), Plaintiff argues that Commerce's use of transaction-specific margins in corroborating the 75.04 percent rate was unreasonable.  <u>See</u> Pl.'s Mot. J. Agency R. at 23-28.  Those decisions, though, are factually dissimilar from this case.  In <u>Am. Silicon</u> the highest transaction-specific margin relied on by Commerce in selecting an adverse facts available rate was 25 percent lower than the rate selected.  Likewise, in <u>Shandong Huarong</u> not one of the transaction-specific margins relied on by Commerce was as high as the adverse facts available rate selected.  Here, on the other hand, Commerce relied on sales margins that exceeded 75.04 percent as well as sales with a calculated margin within a ten percent range of the AFA rate.  <u>Corroboration Memo</u> at 7.

To the extent the corroboration provision is designed to provide respondents with an incentive to cooperate while avoiding the imposition of punitive, aberrational, or uncorroborated margins, <u>see</u> <u>de Cecco</u>, 216 F.3d at 1032, Commerce's corroboration analysis of the 75.04 percent rate satisfied that framework here.  In sum, Plaintiff's total adverse facts available rate of 75.04 percent is supported by substantial evidence and is in accordance with law.

## B. Liquidation Instruction Policy

Plaintiff also presents a facial challenge to Commerce's policy of issuing liquidation instructions to United States Customs and Border Protection ("Customs") within 15 days of

publication of the final results of an administrative review in the Federal Register.  See

http://ia.ita.doc.gov/download/liquidation-announcement.html (Aug. 9, 2002).

    The Court of International Trade's recent decision in SKF USA Inc. v. United States,

31 CIT __, Slip Op. 07-43 (Mar. 23, 2007) ("SKF") requires a brief discussion of jurisdiction

before turning to the merits.  In SKF the court held that 28 U.S.C. § 1581(i) (2000), and not

28 U.S.C. § 1581(c) (2000), is the correct jurisdictional basis for a claim like Plaintiff's

because the agency action—issuing liquidation instructions—is technically not part of the

final results of the administrative review and therefore not covered by 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2000).  SKF at 6-8.  In this case though,

Plaintiff challenged Commerce's liquidation instruction policy during the administrative

review, and Commerce squarely addressed Plaintiff's claim in the Decision Memorandum.

One could argue that the matter was therefore included within the Final Results of the

administrative review and covered by 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C.

§ 1581(c) (2000).  See, e.g., Am. Signature, Inc. v. United States, 31 CIT__, 477 F. Supp.

2d 1281 (2007) (holding that section 1581(c) is proper jurisdictional basis to review issue

that Commerce addressed in administrative proceeding).  The parties do not dispute that

section 1581(c) is a proper jurisdictional basis.

    However vexing this jurisdictional question may be, it is largely academic in this case

because the Court of International Trade ultimately has jurisdiction to hear the claim,

whether under section 1581(c) or 1581(i).  And although these jurisdictional provisions

have different standards of review,[6] Plaintiff's claim is reviewed identically under each; it involves a question of law requiring statutory interpretation and the possible application of Chevron, 467 U.S. at 842-45.

Defendant argues somewhat half-heartedly that the matter is non-justiciable, making general assertions that Plaintiff has "not been injured and no remedy is available," and that Plaintiff's claims are merely "speculative."  Def.'s Resp. Mot. J. Agency R. at 21-22.  The court disagrees.  Plaintiff's facial challenge to the lawfulness of the liquidation instruction policy is appropriate for judicial review. See SKF at 9-12.

On the merits, Plaintiff contends that Commerce may not issue liquidation instructions within the combined 60-day period established by section 1516a(a)(2)(A) for commencing an action in the Court of International Trade (30 days to file a summons, and 30 days thereafter to file a complaint).  See Pl.'s Mot. J. Agency R. at 33-35.  Plaintiff argues that if Commerce does, then entries subject to the administrative review could be liquidated before an interested party perfected its cause of action and obtained an injunction against liquidation. Id.  This would moot one's claim challenging assessed duties for subject entries.  See Mukand Int'l Ltd. v. United States, 30 CIT __, __, 452 F. Supp. 2d 1329, 1333-34 (2006) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983); Ugine & Alz Belgium v. United States, 452 F.3d 1289, 1291-92 (Fed. Cir. 2006)).

_____

[6] For actions governed by section 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii), the court reviews Commerce's determinations under the "substantial evidence" and "in accordance with law" standard.  19 U.S.C. § 1516a(b)(1)(B)(i).  For actions governed by section 1581(i), the court reviews Commerce's actions under the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard.  5 U.S.C. § 706(2)(A) (2000); 28 U.S.C. § 2640(e) (2000).

To support its claim, Plaintiff cites <u>Tianjin Mach. Imp. & Exp. Corp. v. United States</u>,

28 CIT __, 353 F. Supp. 2d 1294 (2004), which states:

> On its face, then, § 1516a(2)(A) allows a plaintiff to <u>wait</u> thirty days before filing its summons, and to <u>wait</u> an additional thirty days before filing its complaint.  The fact that a party <u>could</u> file both its summons and complaint within fifteen days is immaterial.  Because Commerce's fifteen-day liquidation policy directly contravenes the time frame established by § 1516a(2)(A) for filing a summons and a complaint, the Court finds that Commerce's new policy is not in accordance with law.

<u>Tianjin</u>, 28 CIT at __, 353 F. Supp. 2d at 1309 (emphasis in original).

<u>Tianjin</u>, in effect, reads an implied stay of liquidation into section 1516a.  In <u>Mukand</u> this judge read the applicable statutes differently and concluded that the statutory framework "does not administratively suspend or automatically stay liquidation following the final results of an administrative review while an interested party decides whether or not to commence an action or move for an injunction."  <u>Mukand</u>, 30 CIT at __, 452 F. Supp. 2d at 1334.  As <u>Mukand</u> explained:

> [The statute] provides that the Court of International Trade "<u>may</u> enjoin the liquidation of some or all entries . . . covered by a determination of [Commerce] . . . , <u>upon a request by an interested party</u> for such relief and a proper showing that the requested relief should be granted under the circumstances." 19 U.S.C. § 1516a(c)(2) (emphasis added).  The statute further provides that "[u]nless such liquidation is enjoined by the court," entries "<u>shall</u> be liquidated in accordance with the determination of [Commerce] . . . ," 19 U.S.C. § 1516a(c)(1) (emphasis added), which Customs carries out "promptly and, to the greatest extent practicable, within 90 days" after Commerce issues instructions.  19 U.S.C. § 1675(a)(3)(B).  Congress therefore placed the responsibility on interested parties to act affirmatively and request an injunction.

<u>Id.</u> (emphasis in original).

Moreover, the antidumping statute expressly authorizes Commerce to issue liquidation instructions following an administrative review, but does not prescribe a

schedule or methodology for doing so.  See 19 U.S.C. § 1675(a)(3)(B).  There is therefore

a gap in the statute that Congress left for Commerce to fill.  See, e.g., Viraj Group v. United

States, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007) (applying Chevron, 467 U.S. at 844).

Commerce filled the gap by issuing a policy statement on August 9, 2002, notifying

interested parties that Commerce intends to issue liquidation instructions within 15 days of

publication of the final results of review in the Federal Register.  For five years Commerce

has consistently notified interested parties of the policy in the final results of administrative

reviews.

Commerce has a number of factors to consider when issuing liquidation instructions.

Instructions need to be transmitted to Customs in a timely manner because entries

remaining unliquidated on the six-month anniversary of the Federal Register publication

date are deemed liquidated at the rate asserted at the time of entry.  See Int'l Trading Co.

v. United States, 281 F.3d 1268, 1272-73 (Fed. Cir. 2002).  Also, because Customs "has a

merely ministerial role in liquidating antidumping duties," Mitsubishi Elecs. Am., Inc. v.

United States, 44 F.3d 973, 977 (Fed. Cir. 1994), the onus is on Commerce to transmit

correct liquidation instructions to Customs.

For now, the court cannot say that Commerce's gap-filling is unreasonable, and

accordingly, Plaintiff's facial challenge to the 15-day liquidation instruction policy must fail.

That said, the policy is not without its flaws.  As Commerce and Customs continue to

improve the efficiency and automation of the liquidation process, there exists the possibility

Commerce and Customs may "act so quickly," Int'l Trading, 281 F.3d at 1273, as to

practically foreclose interested parties from obtaining judicial review of subject entries

pursuant to 19 U.S.C. § 1516a, and such a foreclosure would render Commerce's policy

unreasonable.  Just how quickly is too quickly will unfortunately have to be sorted out on a

case by case basis.  In Mukand, for example, the entries were liquidated 75 days after

publication of the final results in the Federal Register, and the court ruled as a matter of law

that Commerce (and Customs) had not acted too quickly.  Mukand, 30 CIT at __, 452 F.

Supp. 2d at 1334.

Admittedly, the policy and its potential threat of rapid liquidation leaves interested

parties contemplating suit in the Court of International Trade in a difficult situation.  The lack

of certainty of when liquidation will occur,[7] coupled with the rule that liquidation moots a

challenge to the assessed rates of the subject entries,[8] practically, if not necessarily,

requires interested parties to file a protective summons, complaint, and motion for a

preliminary injunction against liquidation almost immediately after publication of the final

results in the Federal Register, and also obtain a temporary restraining order ("TRO")

against liquidation pending the Court of International Trade's issuance of a preliminary

injunction.

---

[7] Commerce does not notify interested parties when liquidation instructions are actually issued.  They can be issued as soon as the Federal Register notice is published or as late as 15 days thereafter, or sometime beyond the 15-day period if Commerce ignores its policy, see, e.g., Mukand, 30 CIT at __, 452 F. Supp. 2d at 1332-33.  The instructions are communicated electronically to Customs and are not publicly available.  Once Customs receives the instructions, Customs is supposed to liquidate "promptly and, to the greatest extent practicable, within 90 days." 19 U.S.C. § 1675(a)(3)(B).  The only formal notice interested parties receive regarding liquidation of their entries is the general blurb in the final results that Commerce intends to issue liquidation instructions within 15 days, and the subsequent bulletin notice from Customs once liquidation occurs, 19 C.F.R. § 159.9(a) (2006).

[8] See Zenith Radio Corp., 710 F.2d at 810; Ugine & Alz Belgium, 452 F.3d at 1291-92.

Aware of this predicament, the court in <u>Mukand</u> proposed a minor augmentation to Commerce's liquidation policy that might prevent judicial review of antidumping administrative reviews from devolving unnecessarily into a TRO-based practice:

> Commerce can issue instructions that direct Customs to liquidate no earlier than (1) the date that is 90 days after the <u>Federal Register</u> publication date, and no later than (2) the six-month anniversary of that publication date unless liquidation is enjoined pursuant to court order.

<u>Mukand</u>, 452 F. Supp. 2d at 1334-35.  This though remains unsolicited advice.  Commerce has the gap-filling discretion (bounded by the requirement of reasonableness), and it is ultimately for Commerce to decide whether a review and possible revision of its liquidation instruction policy would be worthwhile.

### IV. Conclusion

The court denies Plaintiff's motion for judgment on the agency record and will enter judgment in favor of Defendant sustaining Commerce's <u>Final Results</u>.


                                                            /s/ Leo M. Gordon
                                                          Judge Leo M. Gordon



Dated: May 14, 2007
         New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MITTAL STEEL GALATI S.A.,<br>FORMERLY KNOWN AS<br>ISPAT SIDEX S.A.,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 06-00050 |

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with this opinion, it is hereby

**ORDERED** that Plaintiff's motion for judgment on the agency record is denied; and it is further

**ORDERED** that judgment is entered for Defendant.


                                                    /s/ Leo M. Gordon
                                                   Judge Leo M. Gordon


Dated:  May 14, 2007
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____     By: _____
                                                    Deputy Clerk